**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TONY HEAROD,

        Plaintiff,

  v.

BAY AREA RAPID TRANSIT DISTRICT; T.
PASHOIAN, individually and in his
capacity as a police officer for the
BART Police Department; DOES 1-20,
inclusive,

        Defendants
_____/

No. C 07-6390 CW

ORDER GRANTING IN
PART DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT AND
GRANTING IN PART
PLAINTIFF'S CROSS-
MOTION FOR PARTIAL
SUMMARY JUDGMENT

    Plaintiff Tony Hearod charges Defendant Timothy Pashoian, a

law enforcement officer, with using excessive force in the course

of arresting him without probable cause.  Defendants Pashoian and

Bay Area Rapid Transit District (the District) move for summary

judgment or, in the alternative, partial summary judgment, on the

claims against them.  Plaintiff opposes Defendants' motion except

with respect to his claims for racial discrimination in violation

of the Equal Protection Clause of the Fourteenth Amendment and

California Civil Code § 51.7, and for violation of his Fourteenth

Amendment substantive due process rights.  He cross-moves for

summary judgment with respect to his excessive use of force and

unreasonable seizure claims, but not with respect to his claims brought under state law.  The matter was heard on December 4, 2008. Having considered oral argument and all of the papers submitted by the parties, the Court grants each motion in part and denies each in part.

BACKGROUND

Shortly after 9:00 a.m. on March 26, 2007, Shelley Kushman, a station agent at the 19th St. BART station in Oakland, California, contacted BART police dispatch to report that she suspected a man of selling BART tickets in the station.  Pursuant to California Penal Code § 602.7, any person who sells anything on BART property is guilty of an infraction.  Ms. Kushman described the suspect as an African-American man in his fifties, wearing a black cap, a navy nylon jacket, black pants and a black backpack, and carrying a priority mail package.  She reported that she saw the suspect walk toward the 19th St. station exit.

The dispatcher relayed the information provided by Ms. Kushman to officers in the field.  Three officers responded to the call: Defendant Pashoian, who is a BART police sergeant, and BART police officers Anisa McNack and Wendy Trieu.  Officer McNack arrived at the scene at 9:24 a.m. and observed Plaintiff above-ground in the vicinity of the station entrance.[1]  Plaintiff is an African-American man in his late forties.  At the time of the incident, he was wearing a blue New York Yankees jacket, black pants and a black backpack.  He was not carrying a package.  The record does not reflect whether he was wearing a black cap.

_____

[1] At her deposition, Officer McNack stated that she could not recall Plaintiff's exact location at the time she located him.

2

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Suspecting that Plaintiff was the man reported by Ms. Kushman,

2  Officer McNack radioed dispatch and requested that they verify

3  whether the suspect was wearing a Yankees jacket.  Dispatch radioed

4  back, confirming that the man Ms. Kushman had seen was wearing a

5  Yankees jacket.[2]

6    At this time, Sgt. Pashoian was standing on the corner of 20th

7  St. and Broadway.  He had located Plaintiff across Broadway,

8  standing near one of the entrances to the BART station and speaking

9  on his cell phone.  At his deposition, Plaintiff testified that he

10 had just finished transacting business at a nearby bank and was

11 speaking on his phone with his girlfriend.  He had not been inside

12 the BART station.  Plaintiff began walking across Broadway toward

13 where Sgt. Pashoian was standing.

14   The parties dispute what happened next.  According to

15 Plaintiff, he had gotten half-way across the street when Sgt.

16 Pashoian told him, "Get over here."  Houk Dec. Ex. 4 (Pl.'s Dep.)

17 at 18.  Plaintiff told his girlfriend, "Baby, this officer is over

18 here and he's telling me to get over here; for what reason, I don't

19 know."  Id.  He continued to walk toward Sgt. Pashoian and asked,

20 "What's the problem, Officer?"  Id. at 19.  He directly approached

21 the officer, but he did not disconnect his phone call.  Sgt.

22 Pashoian repeated his direction to "get over here" and told

23 _____

24       [2]At her deposition, Ms. Kushman did not specifically remember
   being asked about the Yankees jacket.  In addition, the audio
25 recording from BART dispatch that was submitted to the Court does
   not reflect a call to Ms. Kushman seeking verification of the type
26 of jacket.  At oral argument, Defendants stated that they had
   recently discovered the recording of this call and asked for leave
27 to submit it as evidence.  Such evidence is unnecessary, however,
   because the recording that was previously submitted demonstrates
28 that the dispatcher contacted Officer McNack to confirm that the
   suspect was wearing a Yankees jacket.

3

Plaintiff, "You know what time it is." <u>Id.</u> at 19. Sgt. Pashoian's statement about the time is a colloquial expression and was equivalent to telling Plaintiff, "You know what I'm talking about." <u>Id.</u> at 20. Plaintiff understood that Sgt. Pashoian wanted to talk with him and "needed [him] to stop." <u>Id.</u> at 20. When Plaintiff was "face to face" in front of Sgt. Pashoian, Sgt. Pashoian grabbed his right arm, twisted it behind his back, spun his body around and "slammed" him into the window of the bank located on the corner. <u>Id.</u> at 20-22. Plaintiff's cell phone "went flying in the middle of the street." <u>Id.</u> at 20. Plaintiff told Sgt. Pashoian he felt like his arm "was going to break" and "begged" him to release it. <u>Id.</u> at 22-23. Sgt. Pashoian continued to hold Plaintiff against the window for about three to four minutes. During this time, Plaintiff did not resist, but he may have attempted to look around for his phone. Sgt. Pashoian then placed Plaintiff in handcuffs and escorted him to a nearby bench. As they were walking toward the bench, Plaintiff complained that Sgt. Pashoian had almost broken his arm. Sgt. Pashoian responded by telling Plaintiff to "shut up," and that if he had wanted to break Plaintiff's arm, he would have done so. <u>Id.</u> at 26.

    Not surprisingly, Sgt. Pashoian tells a different version of events. According to him, he did not initiate contact with Plaintiff until Plaintiff had reached the sidewalk on the side of the street where he was standing. At that point, Sgt. Pashoian motioned to Plaintiff and said something to the effect of, "I need to speak with you." Houk Dec. Ex 7 (Pashoian Dep.) at 25. Plaintiff made eye contact with Sgt. Pashoian but, rather than respond to his request, Plaintiff ignored him, continued to talk on

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

his cell phone and walked past him.  Sgt. Pashoian believed that Plaintiff was not going to stop and might flee the scene.  Id. at 28.  After Plaintiff had taken three or four steps past him, Sgt. Pashoian "placed [his] hand on [Plaintiff's] arm."  Id. at 27. Plaintiff "immediately tensed up and started to pull away" from him.  Id.  Sgt. Pashoian believed Plaintiff was resisting a lawful detention.  Accordingly, he used a rear wrist lock on Plaintiff -- a control hold commonly taught as a means of using low-intensity force to gain control over a subject -- and "pressed him" into the window of the bank.  Id. at 31.  Plaintiff continued to resist his detention.  After Plaintiff complied with Sgt. Pashoian's command to stop resisting, Sgt. Pashoian handcuffed him and sat him down on the bench.  At his deposition, Sgt. Pashoian could not remember Plaintiff complaining about being in pain, but stated that Plaintiff uttered "several expletives" during the course of the detention.  Id. at 35.

It is undisputed that, once Plaintiff had been detained, Ms. Kushman was asked to come to the scene.  She was unable to identify Plaintiff as the man she suspected of illegally selling the BART ticket.  Sgt. Pashoian then removed the handcuffs from Plaintiff's wrists and released him.  The entire incident lasted between ten and fifteen minutes.

Plaintiff now charges Sgt. Pashoian with liability under 42 U.S.C. § 1983 for unlawful seizure and excessive use of force in violation of the Fourth Amendment, as applied to the states by operation of the Fourteenth Amendment.  He also asserts claims against both Defendants for the common law torts of negligence, false imprisonment and battery, and for violation of California

5

1  Civil Code § 52.1.[3]

2                              LEGAL STANDARD

3       Summary judgment is properly granted when no genuine and

4  disputed issues of material fact remain, and when, viewing the

5  evidence most favorably to the non-moving party, the movant is

6  clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

7  56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

8  Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

9  1987).

10      The moving party bears the burden of showing that there is no

11 material factual dispute.  Therefore, the court must regard as true

12 the opposing party's evidence, if it is supported by affidavits or

13 other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg,

14 815 F.2d at 1289.  The court must draw all reasonable inferences in

15 favor of the party against whom summary judgment is sought.

16 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

17 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d

18 1551, 1558 (9th Cir. 1991).

19      Material facts which would preclude entry of summary judgment

20 are those which, under applicable substantive law, may affect the

21 outcome of the case.  The substantive law will identify which facts

22 are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

23 (1986).

24 _____

25      [3]The complaint also asserts claims for racial discrimination
   in violation of the Equal Protection Clause of the Fourteenth
26 Amendment and California Civil Code § 51.7, and for violation of
   Plaintiff's Fourteenth Amendment substantive due process rights.
27 As noted above, Plaintiff does not oppose Defendants' motion for
   summary judgment on these claims, and the motion will thus be
28 granted in relevant part.

United States District Court
For the Northern District of California

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  Nissan, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  Id.

If the moving party does not meet its initial burden of

7

production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.  Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  Id. at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue.  UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.  Id.  Once it has done so, the non-moving party must set forth specific facts controverting the moving party's prima facie case.  UA Local 343, 48 F.3d at 1471.  The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible."  Id.  This standard does not change merely because resolution of the relevant issue is "highly fact specific."  Id.

DISCUSSION

I.   Constitutional Claims

    A.   Unlawful Seizure

        1.   Violation of the Fourth Amendment

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  United States v. Arvizu, 534 U.S. 266, 273 (2002).  It is undisputed that Plaintiff was "seized" within the meaning of the Fourth Amendment because, once he had been subdued and handcuffed, "a reasonable person in his situation would not

have felt free 'to disregard the police and go about his
business.'" Gallegos v. City of Los Angeles, 308 F.3d 987, 990
(9th Cir. 2002) (quoting California v. Hodari D., 499 U.S. 621, 628
(1991)).  However, the parties dispute whether Plaintiff was
arrested, or merely subjected to an investigatory stop.  Different
standards apply to the two types of seizures:  An arrest must be
supported by probable cause.  Id.  But police may conduct a "brief,
investigatory search or seizure" -- also called a "Terry stop"
after Terry v. Ohio, 392 U.S. 1 (1968), the first case to describe
it -- so long as they have "a reasonable, articulable suspicion
that justifies their actions." Gallegos, 308 F.3d at 990.  "The
reasonable suspicion standard 'is a less demanding standard than
probable cause,'" and merely requires 'a minimal level of objective
justification.'"  Id. (quoting Illinois v. Wardlow, 528 U.S. 119
(2000)).

     Whether Sgt. Pashoian's actions constituted an investigatory
stop or an arrest is relevant to determining whether he is entitled
to qualified immunity, and is discussed below.  However, the
distinction is not material to the issue of whether Sgt. Pashoian
violated Plaintiff's Fourth Amendment rights.  His actions violated
the Fourth Amendment in either event:  If they constituted an
arrest, California Penal Code § 836(a) provides that the arrest was
unlawful and therefore unconstitutional.  If, on the other hand,
they constituted an investigatory stop, the Ninth Circuit's
decision in United States v. Grigg, 498 F.3d 1070 (9th Cir. 2007),
mandates the conclusion that the stop was unconstitutional.

     California Penal Code § 836(a) provides:

     A peace officer may arrest a person in obedience to a

9

United States District Court
For the Northern District of California

warrant, or, . . . without a warrant, may arrest a person
whenever any of the following circumstances occur:

(1) The officer has probable cause to believe that
the person to be arrested has committed a public
offense in the officer's presence.

(2) The person arrested has committed a felony,
although not in the officer's presence.

(3) The officer has probable cause to believe that
the person to be arrested has committed a felony,
whether or not a felony, in fact, has been
committed.

Cal. Penal Code § 836(a). Pursuant to this statute, a "warrantless arrest by a peace officer for a misdemeanor is lawful only if the officer has reasonable cause to believe the misdemeanor was committed in the officer's presence." Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 920 (9th Cir. 2001) (quoting Johanson v. Dep't of Motor Vehicles, 36 Cal. App. 4th 1209, 1216 (1995)). The same is true of a warrantless arrest for an infraction, which is even less serious an offense than a misdemeanor.[4] United States v. Mota, 982 F.2d 1384, 1388-89 (9th Cir. 1993). Because an officer is not permitted to make a warrantless arrest for an infraction committed outside his or her presence, any such arrest is "unreasonable," and thus violates the Fourth Amendment. See id.

It is undisputed that neither Sgt. Pashoian nor any other BART police officer witnessed the infraction for which Plaintiff was detained. Accordingly, if Sgt. Pashoian effected an arrest of

_____

[4]The Penal Code further provides, "In all cases . . . in which a person is arrested for an infraction, a peace officer shall only require the arrestee to present his or her driver's license or other satisfactory evidence of his or her identity for examination and to sign a written promise to appear contained in a notice to appear. . . . Only if the arrestee refuses to sign a written promise, has no satisfactory identification, or refuses to provide a thumbprint or fingerprint may the arrestee be taken into custody." Cal. Penal Code § 853.5(a).

10

**United States District Court**
For the Northern District of California

Plaintiff, he violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure.[5]

Under <u>Grigg</u>, Sgt. Pashoian also violated Plaintiff's Fourth Amendment rights even if his actions constituted only an investigatory stop.  That case, which addressed the Fourth Amendment issue in the context of a motion to suppress in a criminal action, involved an investigatory stop of an individual who had been accused of committing an infraction outside the presence of the officers who effected the stop.  The officers responsible for the stop had responded to a telephone call from an individual who reported that a car had just driven past his house with its stereo playing very loudly.  When the first officer appeared at the complainant's house, the complainant told him that "'kids' in the neighborhood had been harassing him with loud music for 'years,' and that he had 'caught' the car in question -- a Mercury Cougar, the driver of which was [the defendant] -- 'booming' music several times in the preceding days, and that on one occasion he had called the police to file a complaint."  <u>Grigg</u>, 498 F.3d at 1072.

While the complainant was filling out a formal citizen complaint, he informed the officer that the offending car was parked down the street in front of a house.  Shortly thereafter, the defendant exited the house, got in the car, and drove away without playing his stereo.  The first officer directed the second officer, who had just arrived, "to stop the car to inquire about

---

[5]Defendants initially argued that Sgt. Pashoian had probable cause to arrest Plaintiff.  In Defendants' reply brief, however, they appear to abandon this argument.

excessive noise, determine the driver's identity, and serve the driver with a citation and summons." Id. at 1072-73.  This officer then initiated a stop of the defendant's vehicle.  After he approached the vehicle, he saw an automatic firearm inside.  He ordered the defendant out of the car, performed a pat-down search, and arrested him after finding concealed brass knuckles.

Reviewing the district court's denial of the defendant's motion to suppress, the Ninth Circuit noted that, while law enforcement officers may, under some circumstances, briefly stop someone "to investigate a reasonable suspicion" that he or she is "involved in criminal activity," the "governmental interest in investigating possible criminal conduct based on an officer's reasonable suspicion" may nonetheless "be outweighed by the Fourth Amendment interest" of the individual "in remaining secure from the intrusion." Id. at 1074-75.  The Grigg court stated that a Terry stop may "be undertaken to prevent ongoing or imminent crime, i.e., when a police officer 'observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.'" Id. at 1075 (quoting Terry, 392 U.S. at 30) (emphasis added).  In addition, the court noted that, in United States v. Hensley, 469 U.S. 221 (1985), "the United States Supreme Court held that 'if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion.'" Grigg, 498 F.3d at 1075 (quoting Hensley, 469 U.S. at 229) (emphasis in Grigg).  The Ninth Circuit observed that, in Hensley, the Supreme Court had "employed a balancing test to weigh 'the

12

United States District Court

For the Northern District of California

nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.'" Id. (quoting Hensley, 469 U.S. at 229). However, the court observed, the "Hensley court explicitly confined its analysis to the felony context, leaving open the question whether the rule could be extended to all past crimes, however serious, i.e., misdemeanors. Thus the Supreme Court's Hensley decision did not answer the issue tendered by this appeal." Id. (citation and internal quotation marks omitted).

In the Ninth Circuit's view, "the obvious and patent public safety risk in allowing a suspect of armed robbery to remain at large" was crucial to the outcome in Hensley. Id. at 1077. "This potential threat of violence created the exigency in Hensley to stop the suspect that justified foregoing the Fourth Amendment's warrant requirement." Id. Such exigency, however, is not present where an individual is supected of having committed a past misdemeanor that does not implicate public safety. The court concluded:

> [A] court reviewing the reasonableness of an investigative stop must consider the nature of the offense, with particular attention to any inherent threat to public safety associated with the suspected past violation. A practical concern that increases the law enforcement interest under Hensley is that an investigating officer might eliminate any ongoing risk that an offending party might repeat the completed misdemeanor or that an officer might stem the potential for escalating violence arising from such conduct, both of which enhance public safety. Conversely, the absence of a public safety risk reasonably inferred from an innocuous past misdemeanor suggests the primacy of a suspect's Fourth Amendment interest in personal security.

13

United States District Court
For the Northern District of California

1   <u>Id.</u> at 1080.[6]  Because there was a complete "absence of any danger

2   to any person arising from the misdemeanor noise violation" at

3   issue in <u>Grigg</u>, the Fourth Amendment prohibited the officers from

4   stopping the defendant.  <u>Id.</u> at 1077, 1081-83.

5        Here, as in <u>Grigg</u>, Plaintiff was detained because he was

6   suspected of having committed a minor infraction outside the

7   presence of the investigating officer.  There was no ongoing risk

8   to public safety to justify Sgt. Pashoian's invasion of Plaintiff's

9   interest in personal security.  Accordingly, <u>Grigg</u> compels the

10  conclusion that, if Plaintiff's detention was an investigatory stop

11  rather than an arrest, it nonetheless constituted an unreasonable

12  seizure in violation of the Fourth Amendment.

13       Defendants argue that <u>Grigg</u>'s holding does not reach this far.

14  In particular, they argue that "the <u>Grigg</u> court placed great stress

15  on the alternative means available to the officers to ascertain Mr.

16  Grigg's identity."  Defs.' Reply Br. at 7.  It is true that the

17  Ninth Circuit stated in <u>Grigg</u>, "An assessment of the 'public

18  safety' factor should be considered within the totality of the

19  circumstances, when balancing the privacy interests at stake

20  against the efficacy of a Terry stop, along with the possibility

21  that the police may have alternative means to identify the suspect

22  or achieve the investigative purpose of the stop."  <u>Grigg</u>, 498 F.3d

23  at 1081.  However, while the <u>Grigg</u> court did note that alternative

24  _____

25       [6]The court declined "to adopt a <u>per se</u> standard that police
    may not conduct a <u>Terry</u> stop to investigate a person in connection
26  with a past completed misdemeanor simply because of the formal
    classification of the offense," because "[c]ircumstances may arise
27  where the police have reasonable suspicion to believe that a person
    is wanted in connection with a past misdemeanor that the police may
28  reasonably consider to be a threat to public safety."  <u>Id.</u> at 1081.

14

**United States District Court**
For the Northern District of California

1    methods of determining the defendant's identity were potentially

2    available, this fact merely bolstered the court's conclusion; it

3    was not central to it.   A passage from <u>Grigg</u> emphasizes this point:

4         [T]he reasonableness of an investigative stop is <u>to a</u>
          <u>degree</u> undermined, where, as here, the police have not
5         pursued alternate available opportunities to gather
          information about the driver.   That Grigg was leaving the
6         area might have warranted an immediate <u>Terry</u> stop at the
          expense of alternative investigative methods <u>in</u>
7         <u>circumstances involving an offense that threatened public</u>
          <u>safety</u>, but the noise violation here created no such
8         exigency.

9    <u>Id.</u> at 1083 (emphasis added).   The Court is mindful of the fact

10   that, had Plaintiff been allowed to leave the vicinity of the BART

11   station, the police officers may not have had any alternative

12   method of determining whether he was the individual Ms. Kushman saw

13   selling the BART ticket.   Nonetheless, while an immediate stop may

14   have been appropriate if the offense Plaintiff was suspected of

15   having committed had posed a threat to public safety, no such risk

16   was present here.   The only exigency was in ensuring that someone

17   who had committed a minor non-violent infraction was issued a

18   citation.   This was not sufficient to justify the intrusion on

19   Plaintiff's interest in personal security.   Accordingly, as a

20   matter of law, Sgt. Pashoian violated Plaintiff's Fourth Amendment

21   right to be free from unreasonable seizure.

22             2.    Qualified Immunity

23   Defendants argue that, even if Sgt. Pashoian's conduct

24   infringed Plaintiff's Fourth Amendment rights, he is entitled to

25   qualified immunity.   The defense of qualified immunity protects

26   government officials "from liability for civil damages insofar as

27   their conduct does not violate clearly established statutory or

28   constitutional rights of which a reasonable person would have

15

United States District Court
For the Northern District of California

known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  The rule
of qualified immunity protects "all but the plainly incompetent or
those who knowingly violate the law." <u>Saucier v. Katz</u>, 533 U.S.
194, 202 (2001) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341
(1986)).

   To determine whether a defendant is entitled to qualified
immunity, the court must apply a two-part analysis.  The first
question is whether the facts, when taken in the light most
favorable to the plaintiff, show that the defendant's conduct
violated a constitutional right. <u>Torres v. City of Los Angeles</u>,
540 F.3d 1031, 1044 (9th Cir. 2008).  If so, the second question is
whether the constitutional right at issue was "clearly established"
at the time of the conduct at issue. <u>Id.</u>  In determining whether
a constitutional right was clearly established, the court should
not consider the right as a "general proposition." <u>Id.</u> at 1045.
"Rather, '[t]he relevant, dispositive inquiry . . . is whether it
would be clear to a reasonable officer that his conduct was
unlawful in the situation he confronted.'" <u>Id.</u> (quoting <u>Saucier</u>,
533 U.S. at 202) (alteration and omission in <u>Torres</u>).  This inquiry
must be made in light of "the law as it existed at the time of the
challenged conduct." <u>Washington v. Lambert</u>, 98 F.3d 1181, 1193
n.20 (9th Cir. 1996)

   As discussed above, Sgt. Pashoian violated Plaintiff's Fourth
Amendment rights by detaining him on the suspicion that he
illegally sold a BART ticket on District property.  Accordingly,
the Court must determine whether those rights were clearly
established at the time.

   At the time of the incident, it was clearly established that

16

it was not lawful for Sgt. Pashoian to make a warrantless <u>arrest</u> for a misdemeanor or infraction that was committed outside his presence.  <u>See, e.g.</u>, <u>Arpin v. Santa Clara Valley Transp. Agency</u>, 261 F.3d 912, 920 (9th Cir. 2001).  However, it was not clearly established that Sgt. Pashoian could not make an <u>investigatory stop</u> for a misdemeanor or infraction that was committed outside his presence where there was no ongoing risk to public safety.  The Ninth Circuit's decision in <u>Grigg</u>, which addressed this issue as a matter of first impression, was filed on August 22, 2007, several months after the incident.  Accordingly, it would not have been clear to a reasonable officer in Sgt. Pashoian's position that he or she was not entitled to subject Plaintiff to a <u>Terry</u> stop if he or she possessed a reasonable suspicion that Plaintiff had sold the BART ticket.  And, because Plaintiff matched the description of the person reported by Ms. Kushman in several respects, Sgt. Pashoian had a reasonable suspicion that Plaintiff had committed an infraction outside his presence.  Accordingly, whether Sgt. Pashoian is entitled to qualified immunity will depend on whether his conduct constituted an arrest or an investigatory stop.

In determining whether a particular police action constitutes an arrest or an investigatory stop, courts must consider not only the intrusiveness of the restraint on the suspect's liberty, but also the reasonableness of imposing such restraint under the circumstances.  As the Ninth Circuit has explained:

> There is no bright-line rule to determine when an investigatory stop becomes an arrest.  Rather, in determining whether stops have turned into arrests, courts consider the totality of the circumstances.  As might be expected, the ultimate decision in such cases is fact-specific.

**United States District Court**
For the Northern District of California

> In looking at the totality of the circumstances, we consider both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken. In short, we decide whether the police action constitutes a <u>Terry</u> stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable <u>given the specific circumstances</u>. As a result, we have held that while certain police actions constitute an arrest in certain circumstances, e.g., where the "suspects" are cooperative, those <u>same</u> actions may <u>not</u> constitute an arrest where the suspect is uncooperative or the police have specific reasons to believe that a serious threat to the safety of the officers exists. The relevant inquiry is always one of reasonableness under the circumstances.

<u>Lambert</u>, 98 F.3d at 1185 (emphasis in original; citations and internal quotation marks omitted). The <u>Lambert</u> court's explanation of the rationale behind the balancing test provides further guidance in determining whether a particular police action constitutes an investigatory stop or an arrest:

> The complexity of this doctrinal scheme -- i.e., that the identical police action can be an arrest under some circumstances and not in others -- originated with <u>Terry v. Ohio</u> and subsequent decisions allowing the police to stop suspects for "investigatory detentions" with less than probable cause. When the investigatory stop became an accepted part of police procedure, courts began allowing police, in certain circumstances, to take intrusive steps to protect themselves as part of a <u>Terry</u> stop, while recognizing that in other circumstances the use of those same methods in connection with such a stop might turn it into an arrest. This doctrinal flexibility allows officers to take the steps necessary to protect themselves when they have adequate reason to believe that stopping and questioning the suspect will pose particular risks to their safety. It is because we consider both the inherent danger of the situation and the intrusiveness of the police action, that pointing a weapon at a suspect and handcuffing him, or ordering him to lie on the ground, or placing him in a police car will not <u>automatically</u> convert an investigatory stop into an arrest that requires probable cause.

<u>Id.</u> at 1186 (emphasis in original; citations omitted).

Although the measures taken to detain Plaintiff were not extreme, the degree of force used against him, together with his placement in handcuffs, was intrusive enough to constitute an arrest if it was not reasonable under the circumstances. See id. at 1189 ("[W]hether the police physically restrict the suspect's liberty is an important factor in analyzing the degree of intrusion effected by the stop."); United States v. Ricardo D., 912 F.2d 337, 340 (9th Cir. 1990) (finding an arrest where the suspect "was patted down, gripped by the arm, told he was not to run anymore, and directed to the back of one of two patrol cars present at the scene"); United States v. Bautista, 684 F.2d 1286, 1289 (9th Cir. 1982) ("[H]andcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical Terry stop.")[7]  Material disputes of fact, however, preclude the Court from determining as a matter of law whether Sgt. Pashoian's conduct was reasonable and, therefore, constituted a mere investigatory stop that would entitle him to qualified immunity.  According to Plaintiff, he walked directly toward Sgt. Pashoian in response to the officer's command to "get over here." Then, when he was face-to-face with Sgt. Pashoian, Sgt. Pashoian

_____

[7]At oral argument, Defendants cited Pierce v. Multnomah County, 76 F.3d 1032 (9th Cir. 1996), in support of their position that Plaintiff's detention did not constitute an arrest.  In Pierce, the plaintiff was taken into custody and spent four hours in jail after she allegedly failed to provide her identifying information so that she could be issued a citation for fare evasion, an infraction.  The Ninth Circuit assumed without discussion that her detention constituted an arrest that was required to be supported by probable cause.  Id. at 1039-41. Pierce did not purport to establish a rule that a four-hour custodial detention is required before detention for a minor infraction is considered an arrest, and thus it has no bearing on the Court's decision.

United States District Court
For the Northern District of California

seized him by the arm, forced him against a window and placed him in handcuffs, apparently for no reason other than that he did not immediately terminate his telephone conversation.  If this account is proved true, Sgt. Pashoian's conduct was not reasonable under the circumstances, and therefore constituted an arrest.  As such, it would be unlawful and Sgt. Pashoian would not be entitled to qualified immunity.  On the other hand, Sgt. Pashoian has testified that he gestured to Plaintiff and told him that he needed to speak with him, but that Plaintiff ignored him, continued talking on his cell phone and walked past him.  If this account is proved true, a reasonable juror could conclude that Sgt. Pashoian's conduct was reasonable under the circumstances.  If so, his actions would constitute an investigatory stop and he would be entitled to qualified immunity.

     Because there are issues of fact with respect to the interaction between Plaintiff and Sgt. Pashoian that preclude a finding of reasonableness as a matter of law, the Court cannot summarily adjudicate the issue of whether Sgt. Pashoian is entitled to qualified immunity.  Accordingly, the Court cannot grant summary judgment in either party's favor on Plaintiff's Fourth Amendment unlawful seizure claim.

     B.   Excessive Use of Force

          1.   Violation of the Fourth Amendment

     Claims of excessive force which arise in the context of an arrest, investigatory stop or other "seizure" of a person are analyzed under a reasonableness standard.  Graham v. Connor, 490 U.S. 386, 395 (1989).  While excessive force claims are generally questions of fact for the jury, Hervey v. Estes, 65 F.3d 784, 791

United States District Court
For the Northern District of California

(9th Cir. 1995), such claims may be decided as a matter of law if the district court concludes, after resolving all factual disputes in favor of the non-moving party, that the reasonableness of the officer's use of force can be determined as a matter of law.  See Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994).  However, summary judgment "should be granted sparingly" because the inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom."  Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002).

The question in an excessive use of force claim is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Graham, 490 U.S. at 397. Determining whether use of force is reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  Id. at 396 (quoting in part United States v. Place, 462 U.S. 696, 703 (1983)).  Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id.  The calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  Id. at 396-97.

Just as triable issues of fact preclude a finding of reasonableness as a matter of law here in the context of distinguishing between an investigatory stop and an arrest, triable

21

United States District Court
For the Northern District of California

issues of fact preclude a finding of reasonableness as a matter of law in the context of Plaintiff's excessive use of force claim. Accordingly, summary judgment cannot be granted in either party's favor on this claim.

        2.   Qualified Immunity

As with Plaintiff's claim for unlawful seizure, Sgt. Pashoian invokes qualified immunity as a defense to Plaintiff's excessive use of force claim.  However, in "Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits." Scott v. Henrich, 39 F.3d 912, 914-15 (9th Cir. 1994) (quoting Hopkins v. Andaya, 958 F.2d 881, 885 n.3 (9th Cir. 1992)).  In other words, if an officer's use of force was not objectively reasonable and thus constitutes a Fourth Amendment violation, a "reasonable officer" in his or her position would necessarily conclude that the use of force was unlawful, and thus qualified immunity is not available. If, on the other hand, the use of force was reasonable and thus did not violate the Fourth Amendment, there is no need for qualified immunity.  Because the Court cannot determine the amount of force that Sgt. Pashoian used and whether it was reasonable as a matter of law, he is not entitled to qualified immunity on this claim.

II.  State Law Claims

As noted above, Plaintiff asserts claims against both Defendants for the common law torts of negligence, false imprisonment and battery, and for violation of California Civil Code § 52.1.  Section 52.1 imposes civil liability on a person who, "whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats,

1   intimation, or coercion, with the exercise or enjoyment by any

2   individual or individuals of rights secured by the Constitution or

3   laws of the United States, or of the rights secured by the

4   Constitution or laws of [California]."  Cal. Civ. Code § 52.1(a).

5       Plaintiff's common law claims against the District are based

6   on California Government Code § 815.2, which provides:

> (a) A public entity is liable for injury proximately
> caused by an act or omission of an employee of the public
> entity within the scope of his employment if the act or
> omission would, apart from this section, have given rise
> to a cause of action against that employee or his
> personal representative.
>
> (b) Except as otherwise provided by statute, a public
> entity is not liable for an injury resulting from an act
> or omission of an employee of the public entity where the
> employee is immune from liability.

Cal. Gov't Code § 815.2

The parties' arguments in connection with Plaintiff's state
law claims duplicate their arguments made in connection with
Plaintiff's constitutional claims.  And, just as summary judgment
is precluded on the constitutional claims, it is also precluded on
the state law claims.

Specifically, Plaintiff's negligence claim is premised on Sgt.
Pashoian's breach of a legal duty owed to Plaintiff.  In moving for
summary judgment, Defendants argue that no such duty was breached
because Sgt. Pashoian's conduct "was lawful and proper."  With
respect to Plaintiff's battery claim, Defendants argue that Sgt.
Pashoian is not liable because he used only reasonable force to
detain Plaintiff.  In arguing for summary judgment on Plaintiff's
false imprisonment claim, Defendants assert that Sgt. Pashoian had
probable cause to arrest Plaintiff.  With respect to the § 52.1
claim, Defendants argue that they cannot be held liable because

23

they did not interfere with any of Plaintiff's constitutional rights. As explained above, reaching these conclusions would require the Court to resolve material issues of fact.[8] Accordingly, Defendants' motion for summary judgment on Plaintiff's state law claims must be denied.

Defendants also argue that they are entitled to discretionary immunity pursuant to California Government Code § 820.2, which provides, "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." However, Plaintiff has pointed out that this section applies only to "basic policy decisions," and not to "operational" decisions such as the ones at issue in this case. See Caldwell v. Montoya, 10 Cal. 4th 972, 980-81 (1995). Defendants do not refute Plaintiff's position in their reply, but instead assert essentially that they are immune from liability under § 820.2 because Sgt. Pashoian did not use excessive force or make an unlawful arrest. This amounts to saying that they did nothing to incur liability in

_____

[8]Although the Court has determined that Sgt. Pashoian violated Plaintiff's Fourth Amendment rights by unlawfully seizing him, California Penal Code § 847(b) provides in part, "There shall be no civil liability on the part of, and no cause of action shall arise against, any peace officer or federal criminal investigator or law enforcement officer . . . acting within the scope of his or her authority, for false arrest or false imprisonment" if the arrest "was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful." Cal. Penal Code § 847(b)(1) (emphasis added). Because the "reasonable cause" language parallels the standard for qualified immunity, Defendants cannot be held liable for false imprisonment if they succeed on their defense of qualified immunity. The Court has held that there are triable issues of fact that preclude resolution of the qualified immunity issue on this motion.

1   the first instance, not that they are entitled to statutory

2   immunity even if they would otherwise be liable.  Because

3   Defendants have not shown that § 820.2 shields them from liability

4   on Plaintiff's state law claims, the statute does not provide a

5   basis for granting summary judgment.

6   III. Punitive Damages

7       Defendants argue that punitive damages are not available

8   against Sgt. Pashoian in connection with Plaintiff's § 1983 claims

9   because there is no evidence that his conduct was "motivated by

10  evil motive or intent, or . . . involve[d] reckless or callous

11  indifference to [Plaintiff's] federally protected rights."  Smith

12  v. Wade, 461 U.S. 30, 56 (1983).  If a jury believes Plaintiff's

13  version of events, however, it could infer an evil motive or intent

14  based on Sgt. Pashoian's use of force without any justification.

15  Likewise, a jury could determine that punitive damages are

16  available in connection with Plaintiff's state law claims; under

17  California law, punitive damages may be awarded "where it is proven

18  by clear and convincing evidence that the defendant has been guilty

19  of oppression, fraud, or malice."  Cal. Civ. Code § 3294(a).

20  Accordingly, the issue of punitive damages against Sgt. Pashoian is

21  one for the jury.

22                          CONCLUSION

23      For the foregoing reasons, the Court GRANTS Defendants' motion

24  for summary judgment (Docket No. 16) on Plaintiff's claims for

25  racial discrimination in violation of the Equal Protection Clause

26  of the Fourteenth Amendment and California Civil Code § 51.7, and

27  for violation of his Fourteenth Amendment substantive due process

28  rights.  The motion is DENIED with respect to all other claims.

1  Plaintiff's cross-motion for partial summary judgment (Docket No.

2  20) is GRANTED to the extent it seeks summary adjudication that

3  Plaintiff's Fourth Amendment rights were violated; it is otherwise

4  DENIED.[9]

5      IT IS SO ORDERED.

6

7  Dated: 12/17/08

   _____
   CLAUDIA WILKEN
8  United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  _____

       [9]Defendants' objections to evidence submitted by Plaintiff are
25  overruled.  The Court did not rely on any inadmissible evidence in
    its ruling.  Plaintiff's motion to strike Defendants' supplemental
26  submission is denied as moot and his objections to the evidentiary
    material in the submission are overruled.  The Court did not rely
27  on the arguments in the submission to conclude that it was not
    clearly established that a _Terry_ stop could not be conducted in
28  connection with the investigation of a completed misdemeanor.